UNITED STATES of America, Appellee,

v.

Christopher MOSCATIELLO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John M. ROONEY,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

James D. CARTER,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Michael F. MURRAY,
Defendant, Appellant.

Nos. 84–1192, 84–1193, 84–1262
and 84–1263.

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1984.

Decided Aug. 26, 1985.

As Amended on Denial of Rehearing
Oct. 31, 1985.

Daniel J. O'Connell, Boston, Mass., with whom Eileen D. Vodoklys, Framingham, Mass., was on brief for defendant, appellant Christopher Moscatiello.

Martin G. Weinberg, Boston, Mass., with whom Kimberly Homan and Oteri, Weinberg & Lawson, Boston, Mass., were on brief for defendant, appellant John M. Rooney.

Marshall D. Stein, Boston, Mass., with whom Cherwin & Glickman, Brian J. McMenimen and Gargiulo & McMenimen, Boston, Mass., were on brief for defendant, appellant James D. Carter.

A. Raymond Randolph, Washington, D.C., with whom Christopher L. Varner, Washington, D.C., was on brief for defendant, appellant Michael F. Murray.

Gary C. Crossen, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WEIGEL,[*] Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Defendants appeal from criminal convictions on drug charges.

During the first part of 1983, federal agents received information implicating defendants-appellants John M. Rooney, Christopher Moscatiello, James D. Carter, and Michael F. Murray, as well as Arthur Barrett and Stephen King, in a conspiracy to possess and distribute illegal drugs. That information was corroborated by information received from law enforcement officials in the Boston area and by spot surveillance conducted by federal agents from the summer of 1982 to April 1983. On April 6, 1983 agents concluded from the pattern of vehicular activity that defendants were observed to engage in that a sale of drugs was imminent. Accordingly, they arrested them on the afternoon of April 6 and conducted searches of a green Dodge camper, a white Ford truck, a garage at 15 Sylvester Road, Dorchester, Massachusetts, and a warehouse at 345 D Street, South Boston, Massachusetts. All four searches uncovered large amounts of baled marijuana.

Moscatiello, Rooney, Carter, Murray, and Barrett were charged two weeks later in a five-count indictment for various drug violations. Counts I and III charged Murray, Carter, Rooney, and Barrett with possessing and conspiring to possess more than one thousand pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(6), 846. Counts II and IV charged Murray, Carter, King, and Moscatiello with separate counts of possession and conspiracy in violation of the same provisions of the United States Code. Murray and Carter were charged in Count V with yet another count of conspiracy in violation of 21 U.S.C. § 846. In a superseding indictment, Murray's brother Joseph was added to all five counts.

Appellants moved to suppress the evidence seized in the vehicular and building searches. These motions were denied in a memorandum dated December 23, 1983. Trial was set for January 23, 1984. On that date, appellants joined in a motion to dismiss for violation of the Speedy Trial Act. The court, after a preliminary review of the motion and with acquiescence of counsel, reserved its ruling and directed the parties to proceed to trial; the court denied the motion on February 10, 1984. On January 23, Rooney and Moscatiello entered conditional pleas of guilty to count

---

* Of the Northern District of California, sitting by designation.

IV, reserving their objections to the court's rulings on the two motions. The other two appellants, Murray and Carter, were found guilty of counts I and II, respectively, after a jury trial.

All four appellants appeal from the district court's denial of their motion to dismiss for violation of the Speedy Trial Act, as well as from the court's refusal to suppress the seized evidence. We affirm.

### I. The Speedy Trial Act

The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, provides that the trials of defendants who plead not guilty shall commence within 70 days of their indictment. 18 U.S.C. § 3161(c). In computing the seventy-day period, the Act provides for certain exclusions as follows:

> **(h)** The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> **(1)** Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> . . . . .
>
> **(F)** delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
>
> . . . . .
>
> **(J)** delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.
>
> . . . . .
>
> **(8)(A)** Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161.

Defendants were indicted on April 20, 1983. Trial began on January 23, 1984, some 278 days later. The parties are in agreement that 173 of those days are clearly excludable, leaving an excess of 35 days over the permitted 70.

The period whose excludability remains in controversy runs from October 17 to December 23, 1983. On October 17, the district court completed hearings on the several motions to suppress filed by the defendants on May 9 and took them under advisement. The court decided these motions on December 23, 1983. Also pending before the court on October 17 were motions for severance, for orders *in limine*, for election of counts, and for controlling the sequence of the government's presentation of evidence, all of which were also filed on May 9; no hearing was held on these latter motions, which were not decided until on or after December 23, 1983.

█ Pursuant to 18 U.S.C. § 3161(h)(1)(J), the district court excluded the 30 days between October 17 and November 16 as time during which the motions to suppress "were actually under advisement by the court." Appellants object on the ground that the court made no showing that it was actually considering the motions on every one of the excluded 30 days.

Arguing that such a showing is necessary for an exclusion under § 3161(h)(1)(J), appellants direct our attention to the report of the Senate Judiciary Committee, accompanying the Senate version of the Speedy

Trial Act of 1974. The Committee amended the bill to exclude time "reasonably attributable to delays during which a matter is actually under advisement," S.Rep. No. 1021, 93d Cong., 2d Sess. (1974), *reprinted in* A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974, at 104 (1980), in response to a suggestion by the Justice Department that the committee resolve an ambiguity in the bill's original language as to the time covered by the exclusion for a "proceeding concerning the defendant." The Committee report cautioned that the Committee did not intend

"in adopting this amendment to give a blanket exception to matters under advisement[,] for the time excluded must be 'reasonably attributable' and the matter must be 'actually under advisement.' Therefore, the judge must be actually considering the question, for example, conducting the research on a novel legal question."

*Id.*

Appellants would have us conclude from this that, absent precise judicial findings showing that the court had actually spent each of the days sought to be excluded working on a motion, the exclusion is not allowable.

Like the Eleventh Circuit, we are not persuaded by this argument. *See United States v. Mers*, 701 F.2d 1321, 1338–39 (11th Cir.) *cert. denied*, —— U.S. ——, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). The "actually under advisement" language in the statute, and the phraseology of the Committee report, do not specify that, in addition to having a matter under advisement, the court must demonstrate that it was working on it each of the days sought to be excluded. Such a requirement would be unprecedented and impracticable. It is, moreover, belied by other parts of the legislative history. The language of the Senate bill was amended before passage by the House of Representatives, which added the phrase, "not to exceed thirty days" to § 3161(h)(1)(J). According to the report prepared by the House Committee on the Judiciary,

[t]he amendment was adopted at the suggestion of Detroit defense attorney Mr. Barris, who said:

Now, I think the language which is now contained within the bill is that a reasonable time should be allowed when a matter is held under advisement by the district judge. This, of course, is a very flexible term, term "reasonable," and I would suggest that a period of 30 days after all oral argument is heard and all briefs have been submitted on the matter under advisement is not an unreasonable period in which the district judge could act, I do not think that this would compel the judge to reach on any particular issue an improvident answer merely because he is held to a time limit of 30 days. And yet, if such a provision or restriction were written into the Act, it would effectively plug up one of the loopholes which I conceive to now exist whereby a district judge were he prone to do so, could well "sit on a matter" for an indefinite period of time and thus rather effectively defeat the purposes of the bill.

The Committee concurs with the views of Mr. Barris and also with the Alaska speedy trial rules of court, which provide that no pre-trial motion shall be held under advisement for more than 30 days. This modification in no way affects the prerogative of the court to continue cases upon its own motion where, due to the complexity or unusual nature of the case, additional time is needed to consider matters before the court, as set forth in section 3161(h)(8). It should also be noted, however, that in such cases the court must set forth with particularity reasons for granting such a motion.

H.Rep. No. 1508, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 7401, 7425–26.

Two conclusions emerge from a reading of this part of the report. First, the House Committee understood the Senate bill to permit a judge to "sit on" a proceeding indefinitely, an interpretation incompatible

with an understanding of the "actually under advisement" language that would only allow the exclusion of time actually spent on research, writing, or reflection. Second, the committee contrasted delays of less than 30 days under the present § 3161(h)(1)(J) with further delays excludable only under the continuance provision of § 3161(h)(8); in the latter case, the committee notes, "the court must set forth with particularity reasons for granting such a motion." We infer that no elaboration of findings or of reasons was thought to be required for § 3161(h)(1)(J) exclusions, which were automatically limited by the 30 day period.

We accordingly hold that the full 30 days between October 17 and November 16 during which the suppression motions were under advisement is excludable under § 3161(h)(1)(J). This still leaves the total of nonexcluded days at 75, or 5 over the statutory limit. The district court explained its exclusion of the remaining time until the suppression motions were decided on December 23, 1983, as follows:

The defendants had also filed a large number of other motions, for severance, for orders *in limine*, election of counts, and for controlling the sequence of the government's presentation of evidence. These motions were pending during consideration of the motions to suppress evidence.

No hearing was held before me on these matters. I did not consider them or take them under advisement until after I had decided the motion to suppress on December 23, 1983. They are therefore not subject to the thirty day provision of § 3161(h)(1)(J) but to the reasonable time requirement implicit in § 3161(h)(1)(F)....

These motions primarily concerned the ordering of the trial. The summary judgment [sic] motion, however, was dispositive. If it had been allowed, the government would not have been able to go forward with trial. I conclude that it was reasonable to hold these motions until I had decided the motion to suppress.

Even though the motion to suppress was under advisement for longer than the permitted *excludable* time of thirty days, it was not held an unreasonable time in my view given the complexity of the testimony and the difficulty of determining the extent to which subjective judgment, albeit expert, should support a finding of probable cause. While the Speedy Trial Act is intended to discourage obsessional delay, it should not be interpreted to discourage thoughtful consideration by the district judges of difficult questions.

█ We agree that at least part of the period through December 23, 1983, during which the remaining (non-suppression) motions were pending was excludable under § 3161(h)(1)(F) in respect to those particular motions. It was reasonable for the court to have withheld decision on these motions until it could decide the suppression motions. These remaining motions, as Judge Skinner stated, "primarily concerned the ordering of the trial." Had the suppression motions been sustained, the prosecution might not have had sufficient evidence to go forward, rendering the procedural motions moot. And while the time spent deciding the suppression motions was greater than the 30 days for which credit is automatically allowed under § 3161(h)(1)(J), it was not unreasonable, in light of their mulitplicity and obvious complexity (as reflected, infra, in the present opinion.) This is not to say, of course, that more than 30 days can be *excluded* under section 3161(h)(1)(J) for deciding the suppression motions. Rather, we simply hold that the additional five days which must be excluded to avoid a violation of the Act are excludable under section 3161(h)(1)(F) as constituting time reasonably attributable to the remaining non-suppression motions.

This case is on all fours with our recently decided case of *United States v. Anello*, 765 F.2d 253, 256–258 (1st Cir.1985), where we excluded time in excess of 30 days reasonably spent in deciding multiple suppression motions that as a practical matter had to be decided prior to other pending motions. Following *Anello*, we affirm the district court's exclusion of such time here.

We conclude that the total nonexcludable time did not exceed 70 days, and that the Speedy Trial Act was not violated.

## II. Search and Seizure Issues

Critical to the resolution of this appeal is a determination of whether there was probable cause to seize or search without warrant the two vehicles at issue—a green camper and a white truck, and by extension, whether there was probable cause to issue search warrants for two buildings—a garage and a warehouse. First, we will set forth a brief summary of the key events of April 6, 1983, the day the contested searches and seizures took place, based on fact findings of the district court.

At approximately 2:25 p.m., federal agents stopped a green Dodge camper driven by Moscatiello and a red Cherokee jeep driven by King at the Allston Toll Plaza on the Massachusetts Turnpike. Both defendants were placed under arrest. Upon entering the cab of the camper to move it to the roadside, DEA Special Agent Powers observed through a rear window of the cab that the camper area contained burlap-covered bales, which he knew to be a common packing for marijuana. Powers immediately broadcast to the other agents his observation of the bales. The camper was then impounded, a search warrant was eventually obtained, and a search of the bales pursuant to this warrant disclosed that they indeed contained marijuana.

At 2:30 p.m., Rooney, who had been followed from the Northern Avenue area, drove a white Ford truck into the driveway of a garage. As Rooney got out of the vehicle he was placed under arrest. One of the agents on the scene indicated he noticed an odor of marijuana coming from the truck. Another agent removed a set of keys from Rooney's hands at the time of his arrest and DEA Special Agent Boeri used one of the keys to unlock the rear door of the truck. Upon opening the door, the agent observed approximately 60 bales of marijuana. After the agents seized the car, the bales were examined some 18 hours later, without obtaining a warrant in the interim.

Based on the discovery of marijuana in the green camper and white truck, federal agents later obtained a warrant to search the garage at 15 Sylvester Road.

During the course of the April 6 surveillance, federal agents observed the white truck and green camper enter the cinder block warehouse at 345 D Street, then exit some 20 minutes later. Agents at that time also observed two men inside the building. After seizing the truck and camper, as well as the blue van shortly after the seizure of the camper, and after arresting the occupants of those vehicles, Carter, Murray, Rooney, and Moscatiello, agents converged on the warehouse. There they observed a short white male, approximately 45 years old, pacing back and forth on D Street in front of the white cinderblock building, looking at traffic as it passed. After agents drove around the block, the man was no longer seen outside the building.

At approximately 2:40 p.m., other agents arrived on the scene and attempts were made to determine if anyone was in the building at 345 D Street by knocking and then banging on the entry door and on the large, overhead doors. Agents went around the building to look through a window but could not see the general interior of the building. At all stages of this process, the agents regularly stated their identities as federal law enforcement agents. Finally, the agents made a forced entry of the building. After a brief view of the premises, they determined that no one was inside, detected a strong odor of marijuana, and observed many burlap-wrapped bales which they believed to contain marijuana. The building was then secured and guarded from the outside.

A search warrant for the warehouse was executed at 11:00 p.m. that evening. In their application to the magistrate for the warrant, the agents disclosed and relied *inter alia* on their search of the truck and their seizure of the camper, but neither disclosed their forced entry into the warehouse nor made use of the fruits of that entry. The later search of the warehouse

pursuant to the warrant uncovered in addition to the marijuana, a red and a blue spiral notebook, tape dispensers, marking pens, and marked pieces of tape that had been affixed to the bales of marijuana.

A. Vehicle Searches

■ Appellants Moscatiello and Rooney contend that both the warrantless stop and seizure of the green camper and the stop and search of the white truck violated the fourth amendment, and that therefore the bales of marijuana found in those vehicles should have been suppressed as tainted fruits of those searches. We find no merit in this contention. We agree with the court below that when the agents stopped and entered the green camper, they had probable cause to believe that contraband was being transported in it and were therefore empowered both to stop and search it under the so-called automobile exception to the warrant requirement under the fourth amendment.[1] *See, e.g., United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Armed with the additional evidence of marijuana in the green camper, the agents had ample probable cause to search the white truck as well.

In viewing the district court's determination of probable cause, we of course look at the facts in the light most favorable to the court's ruling and accept the court's findings unless they are clearly erroneous. *See United States v. Patterson,* 644 F.2d 890, 894 (1st Cir.1981); *United States v. Jobin,* 535 F.2d 154 (1st Cir.1976); 3 C. Wright, Federal Practice and Procedure

§ 678, at 805 & n. 24 (2d ed. 1982) (citing cases). To find probable cause, a court can rely on an "assessment of probabilities in particular factual contexts" that criminal activity may be taking place. *Illinois v. Gates,* 462 U.S. 231, 232, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Here the district court relied on the totality of the circumstances—reliable informant information linking the various codefendants to an ongoing drug ring, coupled with detailed surveillance observations of suspicious vehicular activity—to establish probable cause. While the district judge noted that neither class of evidence would have sufficed by itself, put together they made a strong case for finding probable cause.

The informant evidence came from three separate sources. Informant Glen Castro described his own personal involvement in conversations and drug transactions with Rooney and Barrett during the first part of 1982. These included Rooney's delivery to Castro of a bale of marijuana, a conversation with Barrett where Barrett described the counting of $1 million in drug money, a conversation with Barrett where Barrett indicated he was in charge of a drug operation (at this meeting some $700,000 was in plain view), and generally, the joint involvement of Rooney, Barrett, and others in drug traffic.

A second informant, who had provided reliable information to the FBI in the past, told an agent that Barrett was selling marijuana and cocaine out of his home in April,

1. In his brief, Moscatiello argues from the district court's consistent reference to the "search" of the White Ford truck and the "seizure" of the green Dodge camper that the court rejected the government's assertion that it had probable cause to *search* the camper before federal agents seized it at the toll plaza. We find no merit in the contention. The court doubtless distinguished the "search" of the white Ford truck from the camper because the former was searched immediately while the latter was not fully searched until a warrant was obtained. But there is no reason to distinguish the facts which would provide probable cause to seize the vehicle from those which would provide probable cause to search it: for both purposes it was necessary to find that it was likely being used to transport illegal drugs.

Moscatiello also reads the court's conclusion that it was "persuaded that the officers were justified in arresting the defendants, searching the white Ford truck and seizing the green Dodge camper" as equating the question whether there was probable cause to seize the camper with whether there was probable cause to arrest Moscatiello. Moscatiello then tries to show that the agents lacked probable cause to arrest him. We see no reason to consider the arrest question. As there was probable cause to have seized and searched the vehicle in which he was riding, the court had ample basis for refusing to suppress the contraband which was discovered in the camper.

1982 and had a large supply of both drugs in his livingroom.

A third informant described conversations between Barrett and Joseph Murray in March, 1983 about an incoming marijuana shipment, and averred in a general way that Barrett was part of the "Joe Murray crew", a group known to the FBI as involved in various criminal activities. The third informant connected Barrett to a Ronald Barton, who had been arrested in connection with a purchase of marijuana from an undercover agent in February, 1983. The proposed plan involved the use of a rental truck as a means of transferring marijuana. Although Barton was not convicted, the informant said that he was in fact part of "Mr. Barrett's operation" for marijuana sales.

Rooney contests the reliability of the information the government gained from its informants. Rooney notes that the information provided by two of the informants concerned defendants' activities in April, 1982, a year before their arrests. One of the two, Glen Castro, was serving time for bank robbery when he provided the information. The third informant's information concerned events in February and March of 1983, but the government had no independent confirmation of his reliability, and much of his information was single or multiple hearsay.

These objections are not persuasive. Although a convicted felon, Castro gave very detailed information, asserted to be from first-hand, the tenor of which was substantially corroborated by the two others. The second informant, who corroborated Castro's information as to Barrett, had a track record of reliability. Although both his and Castro's information concerned events in April, 1982, the association of Barrett and Rooney with Barton, who was arrested on an unrelated drug charge but later released, was confirmed by surveillance within a matter of months. While the third informant's information was mostly hearsay, it was not entirely so and was in some respects corroborated by the results of surveillance.

To be sure, the informants' evidence related to drug dealings sometime before the challenged searches. But it was verified and, as it were, updated by the surveillance evidence, which indicated that, right up to their arrests, Rooney and Barrett were up to their old tricks.

And the kind of criminal conduct related by the informers was not the kind which became stale overnight. As one court has stated,

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

*Andersen v. State,* 24 Md.App. 128, 331 A.2d 78 (1975), *aff'd,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

The informant evidence in the present case is far more like a tortoise than a hare. A drug enterprise involving a network of suppliers, distributors, and customers is not created and then willingly dismantled the next day. Assuming, as the informants said, that defendants were operating out of a garage in South Boston, and were dealing extensively in marijuana, a valuable and bulky commodity, early in 1982, it would be reasonable to assume they were still doing the same a year later.

Verification through surveillance began as early as July or August of 1982. The informants' information as to the regular association of Rooney and Barrett was confirmed, as was their occasional association

with Barton and with the Murrays. Meetings among Rooney, Barrett, Barton and the Murrays were observed in the vicinity of the Pier Restaurant on Northern Avenue. Independent information received from state and local officials in March, 1983 indicated that there was a warehouse somewhere in South Boston which was used to store marijuana, though several possible locations for the warehouse furnished by the officials proved to be inaccurate.

On April 5 and 6, 1983, the agents observed defendants to be engaged in a complex pattern of vehicular activity which included trips by the white Ford truck, the green camper and the blue van to a garage and into a warehouse under circumstances suggesting that they were being loaded there, followed by trips under close escort of other vehicles to possible distribution points. The district court made detailed findings about these actions which we need not repeat here. It is enough to say that defendants met with one another, on occasion exchanged vehicles and keys, and drove about in various combinations of vehicles. For example, the white Ford truck was observed to back up to a garage at 15 Sylvester Road, where objects were placed on either side of it, obstructing the view into the garage. When the truck left the garage it was closely followed by Barrett in an automobile, and when the truck stopped at Santoro's subshop, Barrett passed, did a U-turn, and parked by its side. A similar pattern consistent with the transport and delivery of some highly valued substance occurred with respect to the blue van and, later, the white Ford truck and green camper, this time at a cinder block building, the doors of which were opened to admit the vehicles by persons inside, and then closed. A tractor trailer rig was observed inside with a large dark colored container on top. Certain agents who testified at the trial opined, in light of specialized knowledge of drug trafficking, that certain of the observed practices, e.g., the following of the trucks by an escort car at such a close distance as to prevent the intervention of another vehicle, were typical of drug operations. Nothing suggested that defendants were engaged in an ascertainable legitimate business.

In the context in which it arose, the surveillance evidence provided convincing indicia of drug trafficking. Given the informants' evidence that Barrett, Rooney and the Murrays had been dealing in marijuana and cocaine on a systematic basis, it provided powerful reason to believe that all defendants were doing precisely what, in fact, they were doing. Even an unsophisticated observer lacking the prior information would have suspected the actions of men rushing about in a mini-fleet of vehicles between a garage and warehouse in the manner described. Sophisticated observers, such as drug agents, were entitled to draw even more precise inferences, as "[c]onduct innocent in the eye of the untrained may carry entirely different messages to the experienced or trained observer." *United States v. Woolery*, 670 F.2d 513, 515 (5th Cir.) (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.1977)), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *accord United States v. Manchester*, 711 F.2d 458, 461 (1st Cir. 1983).

Rooney and Moscatiello question the basis for Agent Keaney's testimony that the traffic was of a kind frequently employed during the transportation of drugs. Moscatiello argues that no foundation was laid for Keaney's testimony to that effect; however, Moscatiello's brief itself cites to Keaney's testimony that he had conducted "numerous" vehicle surveillances, during several of which "multiple vehicles [were] used ... for counter-surveillance [or] for security." Rooney suggests that the proper universe of experience is not all drug trafficking, in which the use of multiple vehicles for surveillance or security might indeed be common, but drug trafficking in the Northeast, where, to Keaney's own knowledge, no drug hijackings had occurred. But the fact that Keaney knew of no hijackings in the Northeast does not imply that he could not infer that the second vehicles were serving a security or counter-surveillance function; whether or not hijackings were common, defendants

might still regard the risk as worth protecting against, and it is hard to think of any innocent activity which would have induced such precautions.

Rooney argues that the vehicles used by defendants were occasionally seen travelling alone. We do not find these observations inconsistent with Keaney's theory, which only demands that vehicles travel in groups when actually transporting marijuana.

Rooney also makes other arguments, none of which we find convincing. We add that while the driving of vehicles in tandem undoubtedly strengthened the inference of drug smuggling, it was by no means the only basis for such an inference. The shuttling of vehicles back and forth from the garage and the cinder block warehouse, the entire modus operandi of a group at whose center were men who were known drug smugglers, could reasonably be explained only as the agents in fact did explain these actions.

Rooney contends that the government lacked probable cause, on the authority of *United States v. Freitas*, 716 F.2d 1216 (9th Cir.1983), a case also involving multiple informants and corroborative surveillance. While the facts found insufficient to support a determination of probable cause in *Freitas* bear some resemblance to those in the present case, the quality of the informants' tips in *Freitas* was significantly inferior to that of Castro's in that neither of the *Freitas* informants' tips disclosed the basis for its information; Castro, on the other hand, indicated that he himself had received drugs from Rooney. Since the court in *Freitas* noted that if an "informant [speaks] with personal knowledge, then the information is usually deemed reliable enough to support a finding of probable cause," *id.* at 1221, it seems likely that the *Freitas* court, which found the probable cause determination a "borderline" one, *id.* at 1224, would regard the fact that Castro indicated that he spoke from personal knowledge sufficient to tip the scales in the present case the other way. In any

event, we are not necessarily bound by the views of the *Freitas* panel.

■ We conclude that there was ample probable cause for the stop and seizure of the green camper. It follows then that the same facts, with the addition of the sighting of the bales in the green camper, also furnished probable cause to search the white truck. The main argument which Rooney offers to distinguish the search of the white truck is that the vehicle was parked on private property at the time it was subject to a warrantless search. We find, however, that the fact of being parked on private property did not suffice to exempt the vehicle from being searched where probable cause otherwise existed.

Rooney finds some support for his position in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In that case, defendant was arrested inside his home on murder charges, and his cars, which were parked on his driveway, were towed to the police station to be searched. In an opinion attracting only four votes, Justice Stewart held that the search of the impounded car fell outside the automobile exception to the warrant requirement because, *inter alia,* the need to search the car did not arise suddenly at the time of Coolidge's arrest, objects sought were not contraband, the cars were unoccupied and on private property, and Coolidge could not have gained access to the vehicles to destroy evidence.

However, our case is clearly distinguishable. In sharp contrast to the facts in Coolidge, here the agents who arrested Rooney searched the truck immediately after pursuing the defendant to the garage site on the reasonable belief that it contained contraband. Moreover, Coolidge's car had been parked in the driveway of his own home while Rooney was temporarily parked on property, which albeit private, was not *his* property; therefore, he cannot derive any greater expectation of privacy from that fact than if the vehicle had been parked in a public place. Although Rooney attempts to draw a bright line between vehicles on private property and those on

public property, there is a clear distinction between a search of a car that the police had pursued onto private property and one that was long unoccupied and parked in a driveway for a period of time.

As the opinion in *California v. Carney,* — U.S. ——, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), which extends the automobile exception to mobile homes, makes clear, the inherent mobility and pervasive regulation of vehicles form the bases for a reduced expectation of privacy. *Carney,* rather than supporting the public/private distinction advocated by Rooney, merely confirms the special fourth amendment treatment accorded the search of vehicles.

Finally, although it is perhaps true that the FBI agents who arrested Rooney could have blocked off the driveway and immobilized the white truck, and so one of the reasons given in *Coolidge* for not permitting a warrantless search would apply here, the continued vitality of that particular reasoning is doubtful. That section of the *Coolidge* opinion commanded only four votes. Moreover, the Court in *Ross,* in explaining how the rationale for allowing the warrantless *seizure* of an automobile— that it might be driven away before a warrant could be obtained extended to the *search* of the interior of its seats—found that the minimal increase in intrusiveness inflicted by searching a car immediately instead of impounding it and seeking a warrant simply was not of constitutional significance. *Ross,* 456 U.S. at 807 n. 9, 102 S.Ct. at 2163 n. 9.

■ We hold, therefore, that probable cause to believe that Rooney was using the white truck to transport contraband sufficed to support the seizure and search of the truck. Moreover, under *Ross,* a search of the entire vehicle, including, the examination of any closed container that may conceal the object of the search is permissible. *Ross,* 456 U.S. at 825, 102 S.Ct. at 2173. The fact that the bales found in the white truck were not examined until 18 hours later does not render the search illegal in light of the recent Supreme Court decision, *United States v. Johns,* —— U.S.

——, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), holding that a delay of three days before searching containers from impounded trucks was reasonable. *See United States v. McHugh,* 769 F.2d 860 (1st Cir.1985) (a search of bales of marijuana seven days after the seizure of the truck in which they were contained is permissible). We conclude that no violation of the fourth amendment was committed in the warrantless search and seizure of the white truck.

B. Search Warrants

■ Given the combination of the informant information and the corroborated surveillance, and since we hold that probable cause existed to search the white truck parked in the driveway of the garage, we also hold that there was ample probable cause to support the issuance of the warrant to search the garage itself and that the search pursuant to the warrant was permissible.

The issue of the validity of the search warrant for the warehouse, however, merits more discussion. In its Memorandum and Order on Various Motions of the Defendants to Suppress and to Dismiss, the district court held that none of the defendants had standing to contest the legality of the search of the warehouse. The court also ruled that the warrant to search the warehouse was legal since it rested on a showing of probable cause that was independent of and untainted by the prior illegal entry, noting that the omission of any references to the earlier search in the affidavits did not affect the magistrate's decision by enhancing the affidavits' content. The court admitted not only the evidence discovered for the first time *after* issuance of the warrant but also evidence of the bales which were in plain view when the agents made their initial warrantless entry of the warehouse and, of course, remained there until a full search took place pursuant to the warrant that had been subsequently obtained.

Murray and Carter urge us to suppress all evidence seized in the warehouse as the product of an illegal search. They argue

that they both had a reasonable expectation of privacy in the warehouse, and that therefore the trial court erred in holding that they lacked standing to contest the legality of the searches. They further assert that the search warrant for the warehouse was tainted by the agents' failure to mention the earlier warrantless search of the warehouse, requiring the suppression of all evidence seized at the warehouse; in the alternative, they argue that any evidence observed in plain view during the initial unauthorized entry, i.e. the bales wrapped in burlap, must be suppressed as the direct product of a fourth amendment violation even if the later search made pursuant to the warrant was untainted. The government contests each of these arguments, and in addition replies that exigent circumstances justified the entry into the warehouse without a warrant.

### 1. Standing

We believe the court erred in ruling that "[n]one of the defendants have standing to challenge the search of the warehouse, which was owned by a corporation, in the absence of any evidence that any portion of the warehouse was set aside for the personal use of any defendant as corporate officer, employee or financial backer." The lower court's reasoning seems to have been that the fourth amendment affords a defendant no protection unless he either owned the warehouse personally or used some portion of it for his personal use. But there was ample evidence to indicate that Murray and Carter had "a legitimate expectation of privacy in the area searched." *E.g., United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980).

In *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), state officials, acting without a warrant, searched the union office shared by DeForte, a union official, and several other union officials. The Court rejected arguments that DeForte lacked standing to object to the admission of papers seized during the search because the place searched was not his home, or because he had no proprietary interest in his office, or because he shared the office with other officials. The court, per Justice Harlan, concluded that DeForte "could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." *Id.* at 369, 88 S.Ct. at 2124.

■ In the present case, Murray testified that he, Murray's brother, and defendant Carter each put up $20,000 to acquire the warehouse and that the three of them, along with one William Rae, held the stock of Harbor Oil, Incorporated, the corporation that held title to the warehouse, although only the Murrays' names appear on the mortgage used to finance the rest of the warehouse's purchase price. Thus, Murray and Carter, unlike DeForte, had, through their close corporation, a proprietary interest in the searched premises.

More importantly, only the Murrays and Carter had keys to the warehouse, and ·they testified that the warehouse was kept locked, as agents found it prior to the warrantless search; the number of persons afforded access to the warehouse would seem considerably smaller than the number of officemates, union superiors, and invitees that had access to DeForte's office. Murray and Carter also kept personal property in the warehouse, including a jacket found by the agents with $1,000. in the pocket (not to mention the large quantity of marijuana), further indicating an expectation of privacy. We therefore hold that Carter and Murray had standing to contest the search of the warehouse.

### 2. Exigent Circumstances

The government replies that even if Carter and Murray have standing to contest the initial entry of the warehouse, exigent circumstances made the warrantless search and seizure legal; specifically, that, had the agents not entered when they did, they would have run a significant risk that evidence would have been destroyed before a

search pursuant to a warrant could have been effected. We held in *Archibald v. Mosel*, 677 F.2d 5 (1st Cir.1982), that law enforcement officials may conduct a warrantless search that would otherwise be illegal if they have a reasonable perception that exigent circumstances obtain. It is difficult, however, for us to deal with this issue on the record and findings as they presently stand. The district court made no findings on the question of exigency, and while we do not rule out all possibility that the risk of destruction of evidence inside the warehouse was so great as to allow a warrantless entry, the government's position is uphill and, absent findings by the lower court, we are loath to conclude that exigent circumstances existed as now argued. We accordingly do not reach the government's claim of exigency but turn directly, as did the district court, to the question of whether or not to suppress the evidence found in the warehouse on the assumption, *arguendo*, that the warrantless entry was in violation of the fourth amendment.

### 3. The Exclusionary Rule

■ Even assuming that the original, warrantless, entry into the warehouse was illegal, we are not required to invoke the exclusionary rule. Since *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), the Supreme Court has recognized that evidence obtained through an independent, lawful source need not be suppressed even if the police were also led to it through means that violated the fourth amendment or some other constitutional guarantee. The theory behind this rule is clear: where the evidence was discovered through an untainted source and would have been discovered even if the illegality had not occurred, the evidence is not a fruit of the illegality. *Cf. United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

In *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Court was faced with a sequence of an illegal entry followed by a legal one strikingly similar to the present one. In *Segura*, New York Drug Enforcement Task Force officers investigating a cocaine ring stopped two of the suspects and found them to be carrying cocaine. Agents were then authorized to arrest petitioners Segura and Colon and secure Segura's apartment to prevent the destruction of evidence, even though, they were told, a search warrant probably could not be obtained until the next day. At 7:30 that evening, agents established external surveillance of Segura's apartment. At 11:15, Segura entered the lobby of the building. Agents then took him to his apartment and knocked at the door. When a woman later identified as Colon answered the door, agents entered the apartment without requesting or receiving permission, and without having obtained a warrant. Agents conducted a security check of the premises, observing in the process several items of drug paraphernalia; none of the items found was disturbed. Agents took Segura and Colon to DEA headquarters, leaving two agents behind to secure the premises until a search warrant could be obtained. After the warrant was issued at 6:00 p.m. the following day, a search was conducted that turned up a kilo of cocaine and records of drug transactions.

At trial, the district court ruled that no exigent circumstances justified the initial entry. Finding the first entry illegal, and the evidence observed in the security search its direct fruit, it ordered that evidence suppressed. Although it found the warrant authorizing the later search to be valid, it also ordered the evidence found in the later search suppressed, since, but for the illegal entry and subsequent occupation of the apartment during the 19 hours between the initial entry and the issuance of the search warrant, the evidence might have been removed or destroyed; thus, the later-discovered evidence was also "fruit of the poisonous tree." On appeal, the second circuit affirmed as to the first evidence but reversed the holding requiring the suppression of evidence not in plain view, concluding that to indulge in the speculative possi-

bility that the evidence might have been removed or destroyed to control the admissibility of the later evidence would be "prudentially unsound."

The defendants sought review in the Supreme Court solely on the question of whether the evidence uncovered during the later search should have been suppressed; the government did not seek review. In the part of its opinion that commanded a majority, the Court simply held that

"[w]hether the initial search was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized....

... Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here....

... [O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' clause of the discovery of the evidence."

*Segura,* 104 S.Ct. at 3391.

 As for the evidence uncovered for the first time during the warehouse search conducted pursuant to the warrant, *Segura* is on all fours and we necessarily affirm the denial of defendants' motion to suppress. Defendants argue that because the application for the warrant fails to mention the prior entry, the warrant was therefore tainted by the prior illegality. The district court properly rejected this argument for the reason that, absent fabrication of evidence, *see Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the mere omission of irrelevant facts from an affidavit constitutes no reason to suppress the warrant. The omission did not "enhance the contents of the affidavit," *United States v. Strini,* 658 F.2d 593, 597 (8th Cir.1981), nor deceive the magistrate into granting a warrant he would otherwise not have issued, *United States v. Lewis,* 621 F.2d 1382, 1389 (5th Cir.1980)

*cert. denied,* 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981). The fact of the illegal entry did not detract from the evidence related in the application of the overwhelming probable cause that existed antecedent to it.

A harder question is whether the district court should have suppressed the evidence—the marijuana bales—that was in plain view at the time of the illegal entry. As noted earlier, the Supreme Court in *Segura* was not obliged to address whether the evidence observed during the initial illegal search had been erroneously suppressed by the lower courts. As the dissent in *Segura* points out, however, the logic of the majority's reasoning applies equally to the evidence uncovered in the first search as to evidence uncovered in the second: "[t]he warrant provided an 'independent' justification for seizing all the evidence in the apartment—that in plain view just as much as the items that were concealed." *Segura,* 104 S.Ct. at 3400 (Stevens, J. dissenting). That argument is particularly strong in the present case where, unlike in *Segura,* agents entering the premises found them to be deserted, and hence the possibility seems nil that the evidence in plain view would or could have been removed or destroyed before the second search had the illegality not occurred. Put another way, we can be absolutely certain that the warrantless entry in no way contributed in the slightest either to the issuance of a warrant or to the discovery of the evidence during the lawful search that occurred pursuant to the warrant.

In a closely analogous situation, the Court has recently indicated that it will adhere to the independent justification analysis, ruling that where the location of a body was learned from the defendant through an interrogation in violation of *Miranda,* and the body was found pursuant to the defendant's information, the body need not be suppressed where the prosecution demonstrated that the body would inevitably have been discovered through a sweep search that was already underway.

*See Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

We realize that lower courts presented with the present issue have decided that evidence observed in an illegal search that was also observed and seized in a later search must be suppressed. *See United States v. Griffin,* 502 F.2d 959 (6th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *see also Commonwealth v. Benoit,* 382 Mass. 210, 415 N.E.2d 818 (1981) (evidence found as direct product of illegal warrantless search not subject to argument that without search, evidence would inevitably have been discovered through a later search pursuant to a warrant). Arguably the Supreme Court in *Segura* also hinted at this result when it stated that "evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." 104 S.Ct. at 3386. Since the chief, and perhaps sole, rationale for the exclusionary rule is to deter future violations of the fourth amendment, *see Leon,* 104 S.Ct. at 3412 (decided same day as *Segura* ), arguably all evidence first spied through illegal procedures must be suppressed, no matter how "inevitable" its later, legal, discovery. But the reasoning in *Segura* and, certainly, that in *Nix,* lead us to conclude that the marijuana in plain view here upon entry should not be suppressed. This is as clear a case as can be imagined where the discovery of the contraband in plain view was totally irrelevant to the later securing of a warrant and the successful search that ensued. As there was no causal link whatever between the illegal entry and the discovery of the challenged evidence, we find no error in the court's refusal to suppress.

## C. Use of the Blue and Red Notebooks at Trial

During the second search of the warehouse at 345 D Street, agents discovered approximately 500 bales of marijuana. Each bale was marked with a piece of tape bearing two numbers. The numbers on the left of the tape identified the bales; the numbers of the right indicated approximately the weight of each bale.

Agents also seized a red and a blue notebook at the warehouse. The red notebook contains 28 pages with writing on them. Seven of the 28 have a name or apparent name at the top, one of which is "Omar"; six of the seven also have a single list of numbers below the name, which matches the numbers on bales seized during the various searches. The remaining 21 pages contain two columns of numbers. The numbers in the left column run sequentially from 1 to 505; the numbers on the right correspond approximately to the weight of the bales bearing the numbers in the left column. A torn piece of notebook paper matching the paper in the red notebook, with a matching pattern of numbers, was seized from the pocket of James Carter at the time of his arrest. The pages of the red notebook bear the fingerprints of James Carter, Michael Murray, and Joseph Murray.

The blue notebook contains one page of writing, on which the name "Omar" appears. That page also bears James Carter's fingerprints.

The trial court admitted the red notebook into evidence under Fed.R.Evid. 801(d)(2)(E), ruling that there was "a reasonable expectation that [it] might be able to find, at the end of the trial, that it was made by somebody who was engaged in a conspiracy with one or more of the defendants." James Carter objects to the admission of the notebook into evidence. In doing so, Carter does not question the authenticity of the notebook under Fed.R.Evid. 901. We therefore assume that the red notebook is indeed what it seems to be: a record of the weights of bales of marijuana and a partial division of the bales among several persons.

Carter instead excepts to the red notebook's admissibility under Rule 801(d)(2)(E), which provides that "[a] statement is not hearsay if—... The statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Car-

ter argues that the admissibility of the notebook depends on the fulfillment of a prior condition of fact, namely, the fact that it was kept by a co-conspirator, and that therefore, under Fed.R.Evid. 104(b), the notebook was admissible only if evidence was introduced "sufficient to support a finding" that that condition was fulfilled. Since the government presented no evidence that the notebook was kept in a co-conspirator's handwriting, or any testimony by a witness or admission by a co-conspirator that it was produced by one of the co-conspirators, Carter urges us to find that the condition precedent to the notebook's admissibility was not met.

But we think Carter's argument and Rule 801(d)(2)(E) are beside the point. In order for a co-conspirator's written statement to be hearsay, and thus to be inadmissible unless defined not to be hearsay under 801(d)(2)(E), the written statement must be a statement. *See* Fed.R. Evid. 801(c). Federal Rule of Evidence 801(a) defines a statement to be "(1) an oral or written *assertion* or (2) nonverbal conduct of a person, if it is intended by him as an assertion." The only assertions made in the notebook are that certain bales have certain weights, and that certain bales are assigned to certain persons. There is no issue as to the truth of these assertions, regardless of who wrote them down. Use of the red notebook as real evidence linking Carter and the two Murrays to the marijuana operation does not involve the admission of any statements made in the notebook to prove the truth of the matters they assert, and therefore presents no hearsay problem; since the authenticity of the red notebook is unquestioned, the notebook is clearly admissible for this use.

The blue notebook was admitted at trial solely for the purpose of connecting Carter to the warehouse by means of the fingerprints found on it. An appropriate limiting instruction was given to the jury. The trial court denied Carter's request that the writing be covered over when the blue notebook was submitted to the jury, reasoning that to do so would invite its curiosity.

Carter argues that the district court's refusal to cover the writing constitutes error. He notes that the name "Omar" appeared on that page, as it did atop a page of bale numbers in the red notebook. We fail to see what prejudice could result from the exposure of the jury to the word "Omar," and we think the trial court's decision simply to give a limiting instruction well within the scope of the discretion accorded it on evidentiary questions. *See, e.g., United States v. Sorrentino,* 726 F.2d 876, 886 (1st Cir.1984).

*Affirmed.*