**UNITED STATES of America**

v.

**Malcolm G. SAWYER, Defendant.**

**Crim. No. 85–00036–B.**

United States District Court, D. Maine.

March 12, 1986.

Pasquale J. Perrino, Asst. U.S. Atty., Bangor, Me., for the U.S.

J. Hilary Billings, Bangor, Me., for defendant.

## MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

CYR, Chief Judge.

Defendant is charged with three counts of dealing in stolen property, 18 U.S.C. § 2315,[1] and moves to suppress the fruits of the seizure of his GMC truck.

---

1. Section 2315 provides, in pertinent part: Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign com-

## FACTS

In the spring of 1984 Maine State Police [MSP] Trooper Dennis McLellan was assigned to patrol an area encompassing Dover-Foxcroft and Bangor, Maine. In late March 1984 McLellan was informed that stolen trucks were being delivered to his area, and, specifically, that a stolen truck had been delivered to defendant Malcolm Sawyer. McLellan knew that Sawyer had a business located in Dover-Foxcroft which involved both trucking and truck repair. Previously, McLellan had recovered stolen property from Sawyer. As part of the ongoing investigation of the truck thefts, McLellan was instructed to observe Sawyer's place of business periodically. On May 6, 1984, McLellan assisted a Dover-Foxcroft police officer in responding to a call that a prowler had been seen at Sawyer's place of business. While investigating the prowler call at Sawyer's place of business, McLellan observed a GMC Five Star General [hereinafter referred to as the GMC truck], with its hood, motor and transmission removed. On May 23, 1984, while on routine patrol, McLellan observed what appeared to be the same GMC truck, fully assembled, parked outdoors on the premises of Sawyer's business. Sometime after May 23, but before May 31, McLellan was instructed to stop the GMC truck if he saw it on the road and to inspect it in connection with the investigation of truck thefts.

McLellan next saw the GMC truck on May 31, 1984, just south of Bangor, Maine. While driving north on Interstate 95 in a marked police car, McLellan observed the GMC truck traveling south in the opposite lane. McLellan recognized the GMC truck by its shape and by the name, "Sawyer Transport," printed on the side of its cab. McLellan continued traveling north until he reached a turn-around, at which he turned south to follow the GMC truck, eventually locating it in Dysart's Truck Stop [Dysart's] just off the highway. McLellan had not seen the driver at any time, and before he found the GMC truck it had been parked and turned off.

After calling FBI Special Agent Gerald Mahoney and MSP Detective Donald Guerrette, who were investigating truck thefts in the state, McLellan parked where he could observe traffic entering and exiting Dysart's and waited for Guerrette and Mahoney, who arrived around 9:00 that evening; the three examined the GMC truck.

Looking just beneath the rear of the sleeper portion of the cab, McLellan observed that the frame had been cut and then spliced. McLellan readily observed that the rear portion of the truck appeared much newer than the front. Although he considered the appearance of the front of the truck to be consistent with a truck of its age,[2] the rear section appeared to have been more recently painted for the first time[3] and did not show as much pitting or wear as the front. McLellan further noted that the metal tags, usually affixed to the rear axle assembly, were missing. The tags normally carry a part number and identify the gear ratio and manufacturer of the axle assembly. McLellan testified that marks present on the axle suggested to him that the tags had been pried off.

Continuing his examination of the truck, McLellan observed the Vehicle Identification Number [VIN] stamped on the frame rail of the truck near the engine compartment on the driver's side of the vehicle. By looking into the motor compartment over the right (or passenger side) front wheel, McLellan could see the serial number stamped on the engine. In McLellan's

merce, knowing the same to have been stolen, unlawfully converted, or taken;

. . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. 18 U.S.C. § 2315 (1982).

**2.** Prior to the seizure, McLellan learned from state motor vehicle records that the truck was validly registered to Malcolm Sawyer as a 1977 GMC.

**3.** By examining parts of the rear assembly, including the rubber bushings, McLellan determined that some components of the rear section had never been repainted.

opinion the engine serial number had been "double stamped," that is, altered. His opinion was based on the uneven appearance of the numbers, in contrast to the uniform appearance of numbers "gang" stamped at the factory.[4] McLellan also noted that the GMC truck housed a six cylinder engine, whereas its engine compartment appeared to have been designed and built to accommodate a larger engine.

Based on his experience and an examination of the numbers, Agent Mahoney testified that he believed that the engine number had been altered. Mahoney testified that he lifted the hood of the truck to examine the engine serial number more carefully and to touch the digits to determine the evenness of the stamping; Mahoney's tactile examination substantiated his opinion, based on the earlier visual examination, that the engine number had been altered.

After recording its various VIN and part numbers, Mahoney, McLellan and Guerrette concluded their examination of the GMC truck. McLellan and Mahoney both testified that their examination was limited to the exterior of the truck and the limited inspection under the hood, and that the cab of the truck was neither entered nor opened. Mahoney and Guerrette left Dysart's, while McLellan remained at the scene in a location from which he could observe whether the GMC truck left the parking lot.

The next morning, June 1, 1984, Mahoney called the manufacturer of the GMC truck engine, Detroit Allison, to check the engine number that he had observed the previous evening. Detroit Allison informed Mahoney that the number had never been issued for that type of motor, thus confirming Mahoney's opinion that the serial number on the motor had been altered. Mahoney communicated this information to McLellan, who was still at Dysart's, and McLellan proceeded to arrange for the seizure of the GMC truck. Defendant arrived at Dysart's just prior to the seizure of the GMC truck; he protested its seizure, but it was towed to Augusta, Maine and ultimately placed in MSP storage.

## DISCUSSION

The primary issue is whether there was probable cause for the seizure of the GMC truck.[5] As the truck was seized after an examination of its exterior, the first inquiry is whether that examination was lawful.

In *New York v. Class*, —— U.S. ——, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), two police officers stopped a vehicle involved in traffic violations. While the defendant was away from the vehicle talking with one officer, another officer looked for the VIN.

---

4. "Gang" stamping is the simultaneous stamping of all digits of the engine (or other) number.

5. It is clear that, as long as there was probable cause for the seizure of the GMC truck, the officers were not required to obtain a warrant. The Court has recognized since 1925 the "automobile exception" to the general rule requiring a warrant prior to a search or seizure. *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *California v. Carney,* —— U.S. ——, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the Court held that "the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches *without* prior recourse to the authority of a magistrate *so long as the overriding standard of probable cause is met.*" *Id.* at ——, 105 S.Ct. at 2070 (*emphasis added*). The Ninth Circuit has noted that

It follows from the Court's opinion in *California v. Carney,* that if the existence of probable cause alone justifies the warrantless search of a vehicle parked in a public place, certainly a warrantless seizure of such a vehicle *based only on probable cause,* also falls within the automobile exception.

*United States v. Bagley,* 772 F.2d 482, 491 (9th Cir.1985) [overruling prior Ninth Circuit precedent]. Thus, with probable cause, the warrantless seizure of the truck was lawful.

At the hearing it became apparent that defendant is challenging only the seizure of the GMC truck, and not any subsequent action relating to the GMC truck. Defendant objected when the Government sought to elicit testimony as to what happened with the GMC truck *after* it was seized, arguing that such evidence was irrelevant to the issue of probable cause for the seizure. Defendant was clearly correct on this point and the objection was sustained. It is not clear that there was any post-seizure search, but in any event the defendant by his objection has foreclosed consideration of that issue.

First the officer opened the door to look at the door jamb. Then he reached inside to move some papers which were obscuring the spot on the dashboard where VIN's normally are located. As he was doing so, he saw the handle of a gun protruding from beneath the car seat. The gun was seized and defendant was arrested. The Supreme Court held that the limited search involved in uncovering the VIN was lawful.

The Court first considered whether defendant had any reasonable expectation of privacy in the VIN itself. After reviewing the extensive regulation and diminished expectations of privacy inherent in motor vehicles, the Court concluded that

> it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile. The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. *The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a "search."* See *Cardwell v. Lewis, supra,* [417 U.S. 583] at 588–89 [94 S.Ct. 2464, 2468–69, 41 L.Ed.2d 325 (1974)]. In sum, ... we hold that there was no reasonable expectation of privacy in the VIN.

*Id.* at ——, 106 S.Ct. at 966 (*emphasis added*).

Because defendant was seeking to suppress the gun discovered during the course of the intrusion upon the passenger space of the vehicle, the Court considered whether that intrusion was lawful. Noting that "a car's *interior* as a whole is subject to Fourth Amendment protections," *id.* (*emphasis added*), the Court held that the intrusion into the passenger compartment was a "search." After balancing the governmental objectives of the search against the nature of the intrusion, the Court held that the limited search to ascertain the VIN was lawful. *Id.* at ——, 106 S.Ct. at 967–69.

In the present case, the lawfulness of the examination of the *exterior* of the GMC truck follows *a fortiori* from the *Class* case discussion of the unreasonableness of expectations of privacy in a VIN. Observations of the exterior of a vehicle are lawful, as the vehicle is exposed to the public whenever it is operated: "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and contents are in plain view," *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion), *quoted in Class, supra* at ——, 106 S.Ct. at 964–65. It is of no significance that these officers made their observations by looking at the underside of the GMC truck and by shining flashlights through the wheel wells. Although the underside of a vehicle may not be in "plain view," as that term is commonly used, it is nevertheless exposed to the public, in that officers lawfully present at the scene[6] can make their observations without any intrusion into the vehicle. *See generally* 1 W. LaFave, *Search and Seizure,* § 2.2, at 244–45 (1978) [discussing lawfulness of non-intrusive plain view observations]; *cf. Class, supra* at —— – ——, 106 S.Ct. at 965–69 [determination of lawfulness of search necessary only after finding a governmental intrusion into a protected area].

■ The only arguably significant intrusion was the opening of the hood of the GMC truck to make a tactile examination of the engine serial number previously observed. However, the discussion in *Class* leads to the conclusion that this action, like the examination of the underside of the vehicle, was not a fourth amendment search. Unlike the trunk or glove compartment of a vehicle, which must be open in order for any observation of their contents to occur and which are designed to hold

---

**6.** Although Dysart's is privately owned, it is open to the public and frequently used. There is no contention that the officers were not entitled to be on the premises. There is no distinction, insofar as expectations of privacy are concerned, between a vehicle parked on public property and a vehicle parked on private property belonging to someone other than the owner of the vehicle. *See United States v. Moscatiello,* 771 F.2d 589, 599 (1st Cir.1985).

personal effects, the engine compartment may be visually examined, particularly in the area of the engine serial number, without ever entering or opening any part of the vehicle, including the hood or engine compartment area itself.

■ Even assuming that Agent Mahoney's tactile examination of the engine serial number of the GMC truck was a "search," it was nevertheless a reasonable search plainly permitted by the fourth amendment. To determine whether a search is reasonable, the court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). In this case, the governmental interest in checking a highly suspicious part number, as one aspect of an investigation into truck theft, was substantial. Any intrusion upon defendant's fourth amendment privacy interests was minimal, if not altogether nonexistent. Mahoney opened the hood only *after* having lawfully viewed engine numbers which appeared to have been altered; his intrusion into the engine compartment was limited to verifying by touch the suspected engine number alteration. In light of the reduced expectations of privacy in vehicles generally, *see Class*, —— U.S. at —— ——, 106 S.Ct. at 964–69, the limited nature and duration of Mahoney's intrusion and examination, the reasonable grounds therefor, *see United States v. Dadurian*, 450 F.2d 22, 25 (1st Cir.1971) [limited search by FBI agent to find hidden VIN, based upon a reasonable suspicion, was lawful], and the strong governmental interest in the detection and prevention of vehicle theft, the court holds that any warrantless search

involved in the tactile examination of the engine number from within the engine compartment was not violative of the fourth amendment.

■ The question remains whether there was probable cause at the time of the seizure to believe that the GMC truck contained stolen parts. The probable cause required to justify the seizure of a vehicle is the same probable cause required to justify a search. *See Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970); *United States v. Ross*, 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 572 (1982). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

There was probable cause to believe that the GMC truck contained stolen parts. Prior to the seizure, it had been confirmed that the engine number had been altered, which itself evidenced a crime and justified seizure of the truck. *See* Me.Rev.Stat.Ann. tit. 29 § 2185 (1978).[7] Strong corroboration of the officers' belief that there were stolen parts on the GMC truck was provided by the altered engine number, together with the other information possessed by the officers, including: (1) the physical alterations to the truck, including the spliced frame with a newer rear section; (2) the missing identification tags from the rear axle assembly, which appeared to have been pried off; (3) the presence of a six cylinder engine in a truck designed for a larger engine; (4) McLellan's earlier observation of the same GMC truck in a substantially disassembled state on defendant's business premises;[8] (5) information from

---

**7.** Maine law provides that

   Whoever knowingly buys, sells, receives, disposes of, aids in the disposal of, conceals or has in his possession any motor vehicle or trailer from which the manufacturer's serial number or any other distinguishing number or identification mark has been removed, defaced, covered, altered or destroyed for the

purpose of concealment or misrepresenting the identity of said vehicle shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 11 months, or by both.

Me.Rev.Stat.Ann. tit. 29, § 2185 (1978).

**8.** Defendant has not expressly challenged the lawfulness of McLellan's presence at Sawyer's

the informant-theives that stolen trucks had been delivered to the area of Maine where defendant's business was located, and specific information that one stolen truck had been delivered to defendant; and (6) McLellan's previous recovery of a stolen vehicle from defendant.

Considered in light of the training and experience of these officers in vehicle theft investigation, *see United States v. Moscatiello*, 771 F.2d 589, 598 (1st Cir.1985) [sophisticated observers are entitled to draw more precise inferences], the totality of these circumstances fairly insisted that there was probable cause to believe the GMC truck contained stolen parts. *See Chambers*, 399 U.S. at 51–52, 90 S.Ct. at 1981–82.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress the fruits of the seizure of the GMC truck is DENIED.

SO ORDERED.

business on the evening of May 6, 1984. Based upon McLellan's testimony, however, which the court finds to be credible, it is clear that McLellan was lawfully on the premises.

Police officers may make a warrantless entry upon private property for the purpose of protecting people or property. *See 2 W. LaFave, Search and Seizure*, § 6.6 at 467–474 (1978 and Supp.1986). Thus, it is lawful to enter onto private property in response to a call that a prowler is present, *see Mann v. Cannon*, 731 F.2d 54, 59 n. 5 (1st Cir.1984), and evidence observed on the premises in the course of investigating the incident that justified the entry may be seized under the "plain view" doctrine. *See United States v. Estese*, 479 F.2d 1273 (6th Cir. 1973).

While McLellan was talking with a local police officer, the officer received a call that a prowler had been seen at Sawyer's business. At the officer's request, McLellan assisted in investigating the call. Sawyer's property was not fenced in, so McLellan was able to walk about the lot freely to investigate places where a prowler might hide. McLellan testified that he shined his flashlight inside the building to determine whether a prowler might be hiding inside. It was in the course of this investigation that McLellan observed the disassembled GMC truck. McLellan's description of his actions while on the premises is entirely consistent with the purpose of his warrantless entry, which was to investigate a prowler. As it would have been lawful for McLellan to seize any contraband observed during his investigation, *see Estese, supra*, it follows that McLellan's observations while on the premises may later form a basis for probable cause to seize the GMC truck.

McLellan's observation of the truck in front of Sawyer's business on May 23 was plainly lawful, as McLellan testified that the truck was seen in the course of driving by Sawyer's property. *See, e.g., Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ["What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection"].