**Michael Francis MURRAY, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Civil Action No. 11–10435–WGY.

United States District Court, D. Massachusetts.

Nov. 4, 2011.

of the owner and the role of the property in the prohibited activity.") (internal quotations omitted).

Neil J. Gallagher, Jr., United States Attorney's Office, Boston, MA, for Respondent.

Rosemary C. Scapicchio, Law Office of Rosemary C. Scapicchio, Robert L. Sheketoff, Boston, MA, for Petitioner.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

The ramifications of high level FBI corruption seem never ending. *See United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999) (Wolf, J.), *rev'd in part sub nom. United States v. Flemmi*, 225 F.3d 78 (1st Cir.2000); Judgment in a Criminal Case, *United States v. Connolly*,[1] No.

---

1. For a unique judicial perspective on the trial of John Connolly, *see* Richard d'A. Belin, Benchmarks XXIV (MCLE 2011) 143–145.

1:99–cr–10428–JLT (D.Mass. Sept. 16, 2002) (Tauro, J.), ECF No. 696, *aff'd*, 341 F.3d 16 (1st Cir.2003); *Limone v. United States*, 271 F.Supp.2d 345 (D.Mass.2003) (Gertner, J.), *aff'd in part, remanded in part sub nom. Limone v. Condon*, 372 F.3d 39 (1st Cir.2004); *McIntyre v. United States*, 447 F.Supp.2d 54 (D.Mass.2006) (Lindsay, J.), *aff'd*, 545 F.3d 27 (1st Cir. 2008); *Litif v. United States*, 682 F.Supp.2d 60 (D.Mass.2010), *appeal docketed*, Nos. 11–2254, 11–2255, 11–2256 (1st Cir. Apr. 2, 2010).

On January 13, 1994, a jury convicted the petitioner, Michael Francis Murray ("Murray"), of conspiracy to distribute marijuana and the distribution of marijuana. On April 28, 1994, this Court sentenced Murray to thirty years in prison, and the sentence is expected to end on October 21, 2020. That sentence was influenced by Murray's previous conviction, in 1984, for conspiracy to distribute marijuana. Murray now brings this petition for a writ of coram nobis challenging the length of his 1994 sentence. He claims that his 1984 conviction was invalid and that without that conviction, his 1994 sentence would have been reduced. Murray requests that the Court re-sentence him for his 1994 conviction or, in the alternative, hold an evidentiary hearing to determine the outcome of this petition. This Court finds no need for such a hearing and, for the reasons enumerated below, hereby denies Murray's petition for a writ of coram nobis.

## II. PROCEDURAL HISTORY

### A. The 1984 Conviction

On April 6, 1983, Murray was arrested and charged with conspiring to possess with intent to distribute marijuana. United States' Opp'n Pet.'s Writ Coram Nobis ("Opp'n Mem.") 2, ECF No. 21. A grand jury returned an indictment charging him and three co-defendants with conspiracy to possess with intent to distribute more than one thousand pounds of marijuana and four counts of possession with intent to distribute marijuana. *Id.* On July 20, 1983, a grand jury returned a superseding indictment adding an additional co-defendant to each of the counts. *Id.* at 3.

Murray and his co-defendants each moved to suppress evidence that was obtained by the Federal Bureau of Investigation ("FBI") in seizures on April 6, 1983. *Id.* On September 6, 1983, Judge Skinner began a six-day hearing on the motions to suppress. *Id.* Judge Skinner heard testimony from FBI Agents Brendan Cleary ("Agent Cleary"), Roderick Kennedy ("Agent Kennedy"), and John Newton ("Agent Newton"), and from Drug Enforcement Administration ("DEA") Agent Allan Keaney ("Agent Keaney"). *Id.* Judge Skinner took the motion under advisement and ultimately denied it in December 1983. *Id.*, Ex. 8, Mem. & Order Various Mots. Defs. Suppress Dismiss ("Various Mots. Defs.") 22 (not filed electronically). Murray and two of his co-defendants proceeded to trial, at which a jury convicted Murray of conspiracy to possess with intent to distribute marijuana and acquitted him of substantive possession with intent to distribute. Opp'n Mem. 3–4. Judge Skinner sentenced Murray to 48 months imprisonment. *Id.* at 4.

Murray appealed his conviction, asserting a claim under the Speedy Trial Act and challenging the denial of the suppression motion. *Id.* The First Circuit affirmed the conviction on August 26, 1985. *See United States v. Moscatiello*, 771 F.2d 589 (1st Cir.1985). He then appealed to the Supreme Court, which summarily vacated the judgment of the First Circuit and remanded the case for reconsideration of the Speedy Trial Act issue in light of *Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). *See Carter v. United States*, 476 U.S. 1138, 106

S.Ct. 2241, 90 L.Ed.2d 688 (1986). On remand, the First Circuit analyzed and again rejected Murray's Speedy Trial Act claim, but did not reassess the Fourth Amendment suppression issue. *See United States v. Carter*, 803 F.2d 20 (1st Cir. 1986). Murray again appealed to the Supreme Court, which held that the independent source doctrine was applicable to the Fourth Amendment issue and remanded the case to the district court for further factual findings. *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Specifically, the district court was to determine whether the agents would have sought a warrant for the warehouse if they had not made a prior unlawful entry into that warehouse. *Id.* at 543, 108 S.Ct. 2529.

On remand, acting upon an agreement between Murray and the United States, Judge Skinner reduced Murray's sentence to 18 months, which amounted to a sentence of time served. Opp'n Mem. 4.

### B. The 1994 Conviction

On November 14, 1991, Murray was again arrested and charged with conspiracy to distribute marijuana. *Id.* A grand jury returned a superseding indictment on February 27, 1992, charging Murray and five co-defendants with conspiracy to distribute marijuana and the distribution of marijuana. *Id.* at 4–5. On January 13, 1994, following an eighteen-day jury trial, Murray was convicted on all counts. *Id.* at 5. On April 28, 1994, this Court sentenced Murray to 30 years in prison. *Id.* This sentence is expected to end on October 21, 2020. *Id.*

### C. The *McIntyre* Case

In *McIntyre*, 447 F.Supp.2d 54, the family of John McIntyre, one of the victims of James "Whitey" Bulger, brought suit alleging that actions taken by certain FBI agents caused McIntyre's murder. Although that case is only peripherally related to the present petition, Judge Lindsay's factual findings spurred the issue raised here. Specifically, Judge Lindsay found:

In approximately April 1983, Bulger learned that a fellow denizen of the Boston Criminal world, [Murray's brother] Joe Murray, was importing drugs into South Boston without approval from, and payment of tribute to, Winter Hill. In retaliation, Bulger provided information to [FBI Agent John] Connolly about the warehouse in South Boston where Murray was storing a shipment of marijuana. The FBI seized the marijuana, and thereafter Murray commenced the payment of tribute to Bulger for the privilege of warehousing his illegal contraband in South Boston and for protection from Winter Hill.

*Id.* at 94 (citations omitted).

### III. Factual Background [2]

The facts relevant to this petition concern the events immediately preceding Murray's 1983 arrest. These events are briefly set forth below.

### A. Surveillance and Arrest

In 1982 and 1983, based on information from three confidential informants, the FBI believed that Arthur Michael "Bucky" Barrett [3] and John Michael Rooney were

---

**2.** Except where noted, these facts are not materially disputed. In an excess of caution, all reasonable and plausible inferences are drawn against the government. Sadly, government mendacity is here plausible.

**3.** On or about July 26, 1983, Bulger gunned down Barrett, who had turned FBI infor-

mant, and an entirely-uninvolved Donahue on Northern Boulevard, a short distance from the scene of many of the observations discussed here. *Donahue v. United States*, 204 F.Supp.2d 169 (D.Mass.2002) (Lindsay, J.), *rev'd on statute of limitations grounds*, 634 F.3d 615 (1st Cir.2011).

involved in the drug trade. Opp'n Mem. 7. Beginning as early as July 1982, Agent Cleary conducted surveillance of Barrett at his residence in Squantum and Rooney at his residence in Dedham. *Id.* at 9. On February 17, 1983, Agent Cleary followed Barrett to Anthony's Pier 4 Restaurant[4] on Northern Avenue in South Boston. *Id.* Agent Cleary observed Barrett park next to a blue van registered to Murray ("Murray's Blue Van"). *Id.* at 10. The surveillance of Barrett continued in February and March of 1983 and led the agents to a residence at 15 Sylvester Road in Dorchester ("15 Sylvester"). *Id.*

On April 5, 1983, Agent Cleary, along with Agent Kennedy, was again conducting surveillance of Rooney and Barrett. *Id.* The two agents followed Rooney, who was driving a white Ford step van (the "White Van"), from 15 Sylvester to the parking lot of Anthony's Pier 4 Restaurant, where he met Barrett, who was driving a white Mercury Brougham ("Barrett's Mercury"). *Id.* Agent Cleary attempted to follow Barrett as he left this meeting, but Barrett became aware of the surveillance and evaded Agent Cleary. *Id.* Agents Cleary and Kennedy instead followed Rooney back to 15 Sylvester, the address to which Barrett also returned a short time later. *Id.*

Around 10:20 a.m. on April 6, 1983, Agents Cleary and Newton drove to 15 Sylvester and saw the White Van parked in the driveway. *Id.* at 11. When the two agents returned to 15 Sylvester thirty minutes later, the White Van was gone. *Id.* They then drove to South Boston, where they observed the White Van parked on Northern Avenue next to Barrett's Mercury. *Id.* Agent Cleary recognized the driver of Barrett's Mercury as Barrett and the

passenger as Rooney. *Id.* Agent Cleary then took up a position in the parking lot of Anthony's Pier 4 Restaurant to surveil Barrett and Rooney. *Id.*

At 11:30 a.m., Agent Cleary observed Murray's Blue Van pull up next to Barrett's Mercury. *Id.* The driver of Murray's Blue Van got out of the van and walked to the White Van. *Id.* The White Van drove away, but Agent Cleary was unsuccessful in his attempt to follow it. *Id.* Around 11:45 a.m., responding to a radio message from Agent Cleary, Agents Kennedy and Keaney arrived at the parking lot of Anthony's Pier 4 Restaurant. *Id.* at 12. Agents Newton and Kennedy left the parking lot and observed the White Van, with two occupants, parked on Northern Avenue. *Id.* Shortly thereafter, Agent Keaney saw the driver of the White Van, whom he recognized to be Murray. *Id.* Agents Kennedy, Newton, and Keaney observed the White Van pull up next to Barrett's Mercury and Murray's Blue Van, both of which were parked just off Northern Avenue. *Id.*

The White Van and Barrett's Mercury then departed and drove together toward Dorchester. *Id.* Agent Keaney saw that Barrett was driving his Mercury. *Id.* Agents Newton and Kennedy followed the two vehicles to 15 Sylvester, where they observed Barrett get out of his car and go to the front door of the house while the White Van backed into the driveway of 15 Sylvester. *Id.* at 12–13. The agents radioed for additional agents to come to their location. *Id.* at 13.

After fifteen to twenty-five minutes, at around 12:30 p.m., the White Van and Barrett's Mercury left 15 Sylvester and drove northbound on the expressway. *Id.*

---

4. The restaurant is named Anthony's Pier 4 and is located at 140 Northern Avenue in Boston. In the parties' submissions, the restaurant is alternately referred to as the "Pier Restaurant" the "Pier 1 Restaurant" and the "Restaurant." For consistency "Anthony's Pier 4 Restaurant" is used throughout this memorandum.

Agents Keaney and Kennedy followed the vehicles, which Agent Keaney observed were driving in a manner consistent with a technique used to elude police surveillance. *Id.* The two vehicles drove to Northern Avenue, where the White Van pulled over by Santoro's Sub Shop while Barrett's Mercury continued down Northern Avenue, made a u-turn, and drove back toward Anthony's Pier 4 Restaurant. *Id.*

At approximately 12:50 p.m., Agent Cleary drove back toward Northern Avenue from Dorchester. *Id.* At the suppression hearing and trial, Agent Cleary testified that he happened to drive past a warehouse at the corner of First Street and D Street (the "Warehouse") in South Boston and that he fortuitously saw Murray's Blue Van parked next to that Warehouse.[5] *Id.* at 14. After observing this, Agent Cleary proceeded back to Anthony's Pier 4 Restaurant and reported his observation to Agents Kennedy and Keaney. *Id.* at 14.

The agents then saw the White Van pull over next to Barrett's Mercury on Northern Avenue; a GMC Blazer (the "Blazer") registered to Murray's brother, Joe Murray, was also present. *Id.* Shortly after 1:00 p.m., the agents saw Murray and James Carter at Anthony's Pier 4 Restaurant parking lot talking to Stephen King, who was driving a red Jeep Cherokee (the "Jeep"). *Id.* Murray and Carter then went to meet with Barrett and Rooney on Northern Avenue. *Id.* Murray got into the White Van, Carter got into a green Dodge camper (the "Green Camper"), and both vehicles drove to the Warehouse. *Id.* at 14–15.

Agents Newton and Kennedy drove to the Warehouse and took up a position from which they could observe the bay doors of the Warehouse. *Id.* at 15. They observed the White Van and Green Camper arrive at the Warehouse, back up to the doors, and quickly drive into the Warehouse. *Id.* The agents collectively decided at this point that if the two vehicles in the Warehouse left to return to meet Barrett and Rooney on Northern Avenue, they would stop the vehicles and arrest the occupants. *Id.*

Around 2:00 p.m., the White Van and Green Camper exited the Warehouse. *Id.* The agents saw two additional men inside the Warehouse. *Id.* at 15–16. Agents Newton and Kennedy followed the White Van and Green Camper north toward Boston. *Id.* at 16. The two vehicles, which were being driven by Murray and Carter respectively, arrived at Anthony's Pier 4 Restaurant parking lot. *Id.* Murray got out of the White Van and gave the keys to Rooney, who drove the van away. *Id.* Carter turned the Green Camper over to Christopher Moscatiello, who waited for King to arrive in the Jeep before driving to the Massachusetts Turnpike. *Id.*

Around 2:30 p.m., the agents stopped the White Van and the Green Camper. *Id.* Agent Robert Allen ("Agent Allen") and DEA Agent William Powers ("Agent Powers") stopped the Green Camper near the Allston toll booth on the Massachusetts Turnpike. *Id.* Agent Allen placed Moscatiello, the driver of the Green Camper, under arrest. *Id.* Agent Powers went inside the cab of the Green Camper and detected an odor of marijuana. *Id.* He then looked through a curtain and saw a

---

**5.** Murray argues that this testimony was false, and that Agent Cleary actually already knew the location of the Warehouse based on information provided by Bulger, as a confidential informant, to Agent John Connolly ("Agent Connolly"). Pet.s Writ Error Coram Nobis ("Petition") 14, ECF No. 7. For the purposes of this petition, the Court will assume, without deciding, that Murray is correct that Agent Cleary had foreknowledge of where the Warehouse was located.

number of bales that he believed contained marijuana in the back of the Green Camper. *Id.* Agent Powers radioed the other agents to inform them of this discovery. *Id.* at 17.

Minutes later, other agents stopped the White Van as Rooney was backing it into the driveway at 15 Sylvester. *Id.* An agent noticed the odor of marijuana and opened the rear of the truck, where he found sixty bales of marijuana. *Id.* The agents arrested Rooney, and arrested Barrett a few minutes later when he arrived at 15 Sylvester. *Id.*

Shortly after receiving radio messages about the marijuana found in the two vehicles, FBI, DEA, and Customs agents—including Agents Cleary and Newton—pried open one of the doors of the Warehouse. *Id.* The agents remained in the Warehouse for about two minutes, during which time they saw numerous bales of what they believed to be marijuana. *Id.* No warrant had been issued for this entry into the Warehouse. *Id.* at 18.

At approximately the same time, agents arrested Murray and transported him, along with Carter, to the JFK Federal Building to be processed. *Id.* Murray states that he had been arrested before the agents' entry into the Warehouse and that he was present at the Warehouse for that entry. *See* Petition 6. He further states that the agents re-secured the door and kept the Warehouse under surveillance after that point. *Id.* at 7.

## B. Warrant Affidavit

After the arrests, Agent Keaney went to the United States Attorney's Office to draft an affidavit in support of an application for a warrant to search the Green Camper, the Warehouse, and the garage at 15 Sylvester. *See* Opp'n Mem., Ex. 7, Keaney Aff. ("Keaney Aff.") (not filed electronically). Agent Keaney stated that agents were located at both locations in order to prevent the removal of evidence. *Id.* at 1.

The affidavit recited information from three confidential informants. First, Agent Keaney provided information that Agent Cleary gained by talking to an informant in November 1982. *Id.* at 2. This informant was later identified as Glen Castro. *See United States v. Moscatiello,* 771 F.2d 589, 596 (1st Cir.1985). Castro told Agent Cleary that in March 1982, he helped Rooney distribute a number of bales of marijuana in Charlestown, Massachusetts. Keaney Aff. 2. Castro further stated that, in April 1982, he had been present in the basement of the Little Rascals Bar in Boston with Barrett and Rooney and had discussed illegal drugs with them. *Id.* During his interactions with Barrett and Rooney, Castro saw them with $700,000 on one occasion, and heard Barrett mention that he had $1,000,000 in drug money on another occasion. *Id.*

The affidavit then recited information that a second informant ("CI–2") had provided to Agent Kennedy. *Id.* at 3. CI–2 was a reliable informant who had provided the Boston FBI office with information on numerous occasions, which had been corroborated by independent investigation. *Id.* He told Agent Kennedy that, in April 1982, an individual he knew, Richard Harrold, was getting a supply of cocaine and marijuana from Barrett, who had a large stash of cocaine and marijuana in his living room. *Id.*

Agent Keaney then supplied information provided by a third confidential informant, later identified as Bulger. *Id.* The affidavit stated that Bulger had been an informant for more than three years and had provided reliable, corroborated information in the past. *Id.* In March 1983, Bulger had told an unnamed FBI agent (later revealed to be Agent Connolly) that Barrett was a major participant in the "Joe

Murray crew" and that he had seen Barrett and Joe Murray together in Barrett's Mercury. *Id.* Bulger also relayed hearsay statements that Barrett and Joe Murray had discussed the importation of a large amount of marijuana in March 1983. *Id.* Lastly, Bulger told Agent Connolly that Barrett had been involved in, but was not arrested for, a drug operation that had been foiled by an undercover DEA agent. *Id.* at 4. During that undercover DEA operation, agents learned that a shipment of marijuana was going to be taken to an undisclosed warehouse in South Boston. *Id.* Agent Kennedy received information from an unnamed Boston Police officer in late March or early April 1983 that sources had told him that a South Boston warehouse was being used to store marijuana. *Id.*

Lastly, Agent Keaney recited the results of the surveillance of Barrett, Rooney, Murray, and the other individuals involved.[6] *Id.* at 4. Regarding the discovery of the Warehouse, the affidavit stated: "One surveillance vehicle, returning to the area of Northern Avenue, passed the warehouse at West 1st Street and D Street in South Boston and observed [Murray's Blue Van] in the parking lot." *Id.* at 7. The affidavit also included information about the stops of the Green Camper and White Van and the discovery of what the agents believed to be marijuana in those two vehicles. *Id.* Agent Keaney concluded that he believed "that there is probable cause to believe that controlled substances, including marijuana, as well as [other evidence of marijuana trafficking] are concealed and will be found at" the garage at 15 Sylvester, the Warehouse, and the Green Camper. *Id.* at 9–10.

---

**6.** This portion of the affidavit is the same in substance as the facts set out *supra* and need

## IV. ANALYSIS

Murray's petition is based primarily on a single theory. He alleges that, contrary to the statements and testimony of the federal agents, the FBI had prior knowledge of the location of the Warehouse because of information provided by Bulger. Supplemental Mem. Supp. Pet. ("Supplemental Mem.") 2, ECF No. 49. He claims that to avoid disclosing that Bulger was acting as an informant, the agents lied in the warrant affidavit, perjured themselves at the motion hearing and trial, and failed to disclose to him exculpatory information about the source of the information. *Id.* This misconduct, Murray claims, caused violations of his Fourth, Fifth, and Sixth Amendment rights, rendering the proceedings leading to his 1984 conviction fundamentally flawed and necessitating the issuance of a writ of coram nobis. *Id.* The Court addresses each of these claimed constitutional violations in turn.

### A. Legal Standard

█ The writ of coram nobis was available at English common law in order to allow courts to correct their errors of fact. *See United States v. Morgan,* 346 U.S. 502, 507 & n. 9, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *United States v. Sawyer,* 239 F.3d 31, 36–38 (1st Cir.2001). The Supreme Court has confirmed that the remedy remains available in the federal courts, but has stated that it is an "extraordinary remedy only [available] under circumstances compelling such action to achieve justice." *Morgan,* 346 U.S. at 511, 74 S.Ct. 247; *see also United States v. Denedo,* 556 U.S. 904, 129 S.Ct. 2213, 2221, 173 L.Ed.2d 1235 (2009) (stating that the All Writs Act, 28 U.S.C. § 1651, authorizes federal courts to grant a writ of coram

not be repeated here.

nobis). A writ of coram nobis ought only be granted "in those cases where the errors were of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid." *United States v. Addonizio*, 442 U.S. 178, 186, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (quoting *United States v. Mayer*, 235 U.S. 55, 69, 35 S.Ct. 16, 59 L.Ed. 129 (1914)) (internal quotation marks omitted).

 Under First Circuit law, in order to obtain relief pursuant to a writ of coram nobis, a petitioner must provide: (1) "an explanation of why [he] did not earlier seek relief from the judgment"; (2) "a showing the [he] continues to suffer significant collateral consequences from the judgment"; and (3) "a demonstration that an error of 'the most fundamental character' ... occurred." *Hager v. United States*, 993 F.2d 4, 5 (1st Cir.1993). "In reviewing a petition for the writ, a court must presume that the proceedings were correct, and the burden of showing otherwise rests on the petitioner." *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir.2000).

Here, the first two showings above are not at issue. In satisfaction of the first showing, Murray has explained that he could not seek relief from this judgment earlier because information regarding the relationship between Bulger and the FBI was, until recently, unavailable. Petition 17; Supplemental Mem. 1–2. As to the second requirement, at an oral hearing on May 4, 2011, the Court determined that without Murray's 1984 conviction, he would have received a lesser sentence for his 1994 conviction. Because Murray continues to serve the sentence for his 1994 conviction, and because he would be released earlier were this petition granted, he has satisfied the ongoing prejudice requirement. Indeed, under this Court's reading of constitutional *Booker, see United States v. Booker*, 543 U.S. 220, 125 S.Ct.

738, 160 L.Ed.2d 621 (2005), absent Murray's 1984 conviction, the thirty year sentence it imposed on him in 1994 would be unconstitutional were it imposed today. *United States v. Kandirakis*, 441 F.Supp.2d 282, 286–87 (D.Mass.2006). Thus, all that remains for this Court is to determine whether Murray has demonstrated the existence of a fundamental error that calls into question the validity of his 1984 conviction.

## B. Warrant Affidavit

 The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. An affidavit in support of an application for a search warrant must show probable cause that a crime has been committed and that evidence of that crime is located at the place to be searched. *United States v. Zayas–Diaz*, 95 F.3d 105, 110–11 (1st Cir. 1996). "The 'totality of the circumstances' disclosed in the supporting affidavits must demonstrate 'a *fair probability* that contraband or evidence of a crime will be found in a particular place.' " *Id.* at 111 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

 A warrant application cannot be based on false statements. *See Franks v. Delaware*, 438 U.S. 154, 167–68, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Although a warrant affidavit benefits from a presumption of validity, if a defendant alleges that the affidavit contains deliberate falsehood or willful disregard for the truth and those allegations are supported by an offer of proof, a court must inquire into the veracity of the affidavit. *Id.* at 171, 98 S.Ct. 2674. If the allegedly false material was necessary to the finding of probable cause, the court must hold a hearing to determine whether the government affiant's statements were, in fact, false. *Id.* at 172, 98

S.Ct. 2674. If, however, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72, 98 S.Ct. 2674. A court must perform the same analysis when a defendant alleges that the warrant affidavit suffered from an intentional material omission rather than deliberate falsehood. *United States v. Hadfield,* 918 F.2d 987, 992 (1st Cir. 1990).

### 1. Facts At Issue

The Court must first decide what "hypothetical warrant affidavit" to consider in order to determine whether probable cause still would have existed without the alleged falsehoods. Murray implies that the Court ought excise all information about the Warehouse, leaving no link between the drug operation, the marijuana found in the two vehicles, and the building. *See* Supplemental Mem. 7–15. He concludes that, once modified to remove false information, "[t]here is no evidence in the affidavit about any warehouse, let alone the specific warehouse that the agents eventually searched. In addition to there being no mention of the specific warehouse, there was also no information to establish that marijuana was presently stored at the warehouse." *Id.* at 10–11.

This goes too far. Although Murray has made a "substantial preliminary showing," *see Franks,* 438 U.S. at 156, 98 S.Ct. 2674, that Agent Cleary and, in turn, Agent Keaney, lied about how they came to know the location of the Warehouse, Murray has proffered no evidence that the agents' other observations of the Warehouse and the vehicles coming and going therefrom were fabricated. Moreover, although Murray has established that the third confidential informant was Bulger, he has given the Court no reason to doubt the reliability of the other two informants, both of whom offered much more detailed information. Murray's insinuations that the other informants' were simply government fabrications, *see* Supplemental Mem. 14, are completely unfounded.

Thus, the Court will assess the materiality of the affidavit's alleged false or omitted information regarding the discovery of the Warehouse and Bulger's identity. But because Murray has made no preliminary showing concerning his broader allegations of fabrication, he is not entitled to a *Franks* hearing with respect to those allegations.

### 2. Materiality

Next, the Court must determine whether the affidavit would have been sufficient to support a finding of probable cause had Agent Keaney identified Bulger as the third confidential informant and the source of the information about the location of the Warehouse, and had Agent Cleary's story that he came across the Warehouse by chance been omitted. The Court need not consider whether Agent Keaney himself knew of Bulger's role or of the falsity of Agent Cleary's story since both were government agents. *See Franks,* 438 U.S. at 164 n. 6, 98 S.Ct. 2674; *United States v. D'Andrea,* 648 F.3d 1 (1st Cir.2011) (explaining that *Franks* cannot be interpreted to "allow the police to slip lies into affidavits with impunity by simply passing them through an officer ignorant of their falsehood").

First, Murray argues that the omission of Bulger's identity was material because its inclusion would have rendered the entire affidavit unreliable. Supplemental Mem. 15. He claims that knowledge of Bulger's involvement would have raised the possibility that the agents had fabricated the entire investigation and surveillance in order to appease Bulger. *Id.* This argument is entirely speculative, goes well be-

yond what the proffered evidence actually suggests, and the Court rejects it completely.

Only two paragraphs in the affidavit relate to Bulger, or to information he provided to the agents. The first paragraph is concerned entirely with Bulger's past reliability as an informant. The second paragraph states that Bulger informed Agent Connolly that Barrett was part of the "Joe Murray crew" and that Barrett and Joe Murray had discussed the importation of marijuana in March 1983. The Court will assume that identifying the informant as Bulger would have rendered all this information unreliable and incapable of supporting a finding of probable cause. Nonetheless, Bulger's information was only a small part of the affidavit, and the remainder readily establishes probable cause to search the Warehouse.

Two other informants provided much more detailed information about the involvement of Barrett and Rooney with large-scale marijuana distribution. Although the affidavit did not recite any facts about the past reliability of the first informant, Glen Castro, no such facts are required in order for a reviewing magistrate properly to consider Castro's tips about Barrett's sales of large quantities of marijuana. See *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (overruling previous requirement that informant tips in warrant affidavits meet a two-pronged test of the basis of the informant's knowledge and the veracity or reliability of the informant); *see also Massachusetts v. Upton*, 466 U.S. 727, 732, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (explaining that *Gates* replaced the two-pronged test with an analysis addressing the totality of the circumstances). Moreover, the affidavit did provide information regarding the reliability of the second informant, who also linked Barrett to the distribution of marijuana. Keaney Aff. 3.

The affidavit also detailed the observations that the various agents had made during their surveillance of Barrett, Rooney, Murray, and their associates on April 5 and 6, 1983. *See* Keaney Aff. 5–9. The agents observed the individuals and a number of vehicles moving in bizarre patterns. "The informers' information … illuminate[d] the unusual but otherwise inexplicable activity of the defendants." Various Mots. Defs. 22. This conclusion is further supported by the First Circuit's analysis, which focused heavily on Castro's information and largely dismissed Bulger's information as "mostly hearsay" that "was in some respects corroborated by the results of surveillance." *Moscatiello*, 771 F.2d at 597. Thus, even without the information provided by Bulger, probable cause existed to believe that marijuana was contained in the vehicles and Warehouse being used by Murray and his associates.

Second, Murray contends that had the affidavit correctly stated that Bulger provided the FBI with the location of the Warehouse, and had it omitted Agent Cleary's allegedly false story of fortuitous discovery, the affidavit would not have supported a finding of probable cause to search the Warehouse. Supplemental Mem. 15. The Court finds this argument unpersuasive. The manner in which the Warehouse was discovered is ultimately irrelevant to the sufficiency of the affidavit. Probable cause existed because of what the agents observed at the Warehouse, and Murray has made no showing that any of the agents' observations were untruthful.

Regardless of whether Agent Cleary discovered the Warehouse by chance, or knew to go there because of information provided by Bulger, he and his fellow agents observed the White Van and Green Camper leave the Warehouse. Shortly thereafter, acting upon probable cause, the

agents searched those two vehicles and discovered large quantities of marijuana in them. This discovery was recited in the search warrant affidavit. Keaney Aff. 8–9. Based on the proximity in time, finding bales of marijuana in the two vehicles created probable cause to believe that evidence of the distribution of marijuana would be found in the Warehouse they just left. Thus, even had the affidavit omitted Agent Cleary's story and stated instead that Bulger provided the FBI with the location of the Warehouse, the warrant to search the Warehouse would have been issued and the marijuana and other evidence of the drug business would have been discovered and used against Murray.

None of the alleged falsehoods in the affidavit were material to the magistrate's decision that probable cause existed to search the Warehouse. As such, Murray's argument that the search was invalid fails, and his petition for a writ of coram nobis cannot prevail on this ground.

## C. Trial Testimony

Murray also argues that his trial was fundamentally flawed because Agent Cleary, and possibly other federal agents, gave false testimony at the suppression hearing and trial. Supplemental Mem. 14–15. Specifically, he claims that Agent Cleary falsely testified that he came across the Warehouse serendipitously when, in fact, he had foreknowledge of the Warehouse's location because of information provided by Bulger. *Id.* If this perjury had been known, Murray claims, none of Agent Cleary's testimony would have been credited and Murray would not have been convicted at trial. *Id.* at 15.

 The Supreme Court has long held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct.

763, 31 L.Ed.2d 104 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)). The discovery that such deliberate deception took place does not, however, automatically require vacation of a conviction and a new trial. *See id.* at 154, 92 S.Ct. 763. Instead, a court must determine whether the false testimony was material, and the verdict only "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also Giglio,* 405 U.S. at 154, 92 S.Ct. 763; *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In assessing materiality, a court ought consider the effect of both the incorrect evidence and the perjury itself. *United States v. Huddleston,* 23 F.Supp.2d 72, 78 n. 2 (D.Me.1998).

 Here, the allegedly perjured testimony was not material to Murray's 1984 conviction. First, as discussed above, the incorrect information itself has no bearing on Murray's guilt or innocence. Regardless of how Agent Cleary and the other federal agents came to know about the Warehouse, they observed the White Van and Green Camper leave the Warehouse, stopped the vehicles a short time later, and discovered marijuana in them. The agents identified Murray as the driver of the White Van when it left the Warehouse and saw him pass the keys to Rooney, who was driving the White Van when the agents stopped it. Murray has presented no reason for the Court to believe that any of the testimony regarding these observations was false. Given such strong evidence linking Murray to the marijuana discovered in the White Van and the additional marijuana and evidence of marijuana distribution found at the Warehouse, there is no reasonable likelihood that the jury

would have acquitted Murray had Agent Cleary testified that he had prior knowledge of the Warehouse and did not discover it by chance.

Second, contrary to Murray's claims, such perjury by Agent Cleary would not require all his testimony to be discredited. Murray states, and this Court agrees, that Agent Cleary and the other FBI agents had a clear reason to lie about the source of the information: to protect Bulger as a confidential informant. Had Agent Cleary testified in open court that Bulger had provided the FBI with information, Burger would have become useless as an informant. None of Agent Cleary's other testimony is implicated by this rationale, however, so there is no reason to believe that he fabricated his entire testimony. Moreover, apart from his unsubstantiated, fanciful claims of total fabrication in order to please Bulger, Murray does not offer any reasonable explanation for why Agent Cleary and the other agents would have falsified the rest of their testimony. Accordingly, the Court holds that the effect of the perjury itself is minimal and that there is no reasonable likelihood that the jury would have disbelieved significant parts of the agents' testimony had it known that Agent Cleary lied about the source of his information about the Warehouse in order to preserve Bulger's value as an informant.

Because there is no reasonable likelihood that either the incorrect information or the perjury itself would have changed the result of Murray's trial, the Court holds that the alleged false testimony at the suppression hearing and trial were not material. Murray's argument is unavailing, and he cannot prevail in this petition for a writ of coram nobis on this ground.

### D. *Brady* Disclosure

Murray's last argument is that the government violated his rights under *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing to him their previous knowledge about the Warehouse and the fact that Bulger was the source of that knowledge. Supplemental Mem. 20. He claims that "the government and its agents suppressed material and exculpatory evidence that would have undermined the entire case against Murray." *Id.* at 20. Were Murray to have been given this information, he argues, he could have used it to impeach the suppression hearing and trial testimony of the government agents. Murray also claims that he could have argued that the perjury by the government agents created reasonable doubt of Murray's guilt, or "raised the defense that Bulger had organized the entire marijuana storage process in order to deliberately entrap and frame Murray and others for Bulger's own personal gain." *Id.*

 In *Brady,* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194; *see also United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (extending the *Brady* duty, which had been imposed on the states through the Fourteenth Amendment, to the federal government through the Fifth Amendment). The government's duty extends to evidence in the possession of the prosecution as well as evidence in the possession of agents who took part in the investigation. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States*

*v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Here, Murray argues that the government's failure to disclose that Bulger had provided information regarding the location of the Warehouse before April 6, 1984, was a *Brady* violation and warrants vacation of his 1984 conviction. In support of this argument, he offers only cursory explanations of how this information would have made a difference at the trial or in defense counsel's preparation for the case. The Court finds that none of these rationales leads to a reasonable probability that the result would have been different, thus, no constitutional violation occurred.

First, Murray's argument that he could have used the undisclosed information to impeach the testimony of the government agents at the suppression motion hearing and trial fails for much the same reason as his warrant affidavit and perjury arguments fail. Even assuming that Agent Cleary did lie about how he came to be at the Warehouse on April 6, 1984, Murray offers no evidence that Agent Cleary did not actually go to the Warehouse that day and see Murray's Blue Van parked next to it. There is also no information to challenge the fact that, later that day, Agents Newton and Kennedy went to the Warehouse and observed the White Van and Green Camper back into the bay doors, then depart again a short time later. Murray was identified as the driver of one of these vehicles. These vehicles, with new drivers, were then stopped less than an hour later and found to be carrying large quantities of marijuana.

Based on these facts, which are affected by neither the alleged perjury nor the undisclosed evidence, probable cause existed to support the warrant to search the Warehouse. Moreover, the government had strong evidence connecting Murray to large quantities of marijuana, leading directly to his conviction. The undisclosed evidence was only peripherally related to these essential facts and, thus, immaterial to the denial of the suppression motion and Murray's conviction. Accordingly, the government's nondisclosure of Bulger's role as an informant and of the source of the agents' knowledge about the Warehouse was not a violation of the Due Process Clause of the Fifth Amendment.

Second, Murray's outlandish argument that, had the government disclosed the participation of Bulger as an informant, Murray would have been able to argue that Bulger had framed him for possession of the marijuana, is completely unsupported by any facts or reasonable inferences. Murray proffers no evidence of this entirely speculative theory. Although Murray may well have made such an argument at the hearing or trial, lacking any evidentiary support, no reasonable judge or jury would have credited this theory. As such, there is no reasonable probability that the outcome of either proceeding would have been different had the government disclosed the information.

The fact that the FBI knew about the Warehouse prior to April 6, 1984, because of information provided by Bulger, was not material to the denial of Murray's motion to suppress or his conviction at trial. Had this information been disclosed to Murray, there is no reasonable probability that the outcome of his proceedings would have been different. Thus, no constitutional violation occurred and the *Brady* argument in favor of the writ of coram nobis fails.

## V. CONCLUSION

Murray makes a wide variety of allegations regarding the government's conduct in the investigation and prosecution of his unlawful activities. These range from the fanciful—that "the federal agents fabricated all of the alleged informants and lied

about an entire investigation in order to continue to appease Bulger," Keaney Aff. 15—to the plausible—that Cleary knew the location of the Warehouse before April 6, 1983, but concocted his story of serendipitous discovery to shield Bulger's identity as an informant.

Based on Murray's allegations, his supporting documents, and Judge Lindsay's findings in *McIntyre,* the Court holds that Murray has made a substantial preliminary showing with respect to two possible factual errors involved in his 1984 conviction. First, he has asserted, and the government has conceded, that the third confidential informant identified in the warrant affidavit was Whitey Bulger. Second, Murray has alleged that Bulger provided the FBI with the location of the Warehouse prior to any observations of April 6, 1983. For the purpose of this petition, the Court has assumed the truth of this allegation.

Murray's remaining allegations are entirely speculative. He has proffered no evidence in support of his claim of large-scale FBI fabrication or his claim that Bulger framed him by planting evidence of marijuana distribution. The Court holds that Murray has failed to sustain his burden to demonstrate the need for an evidentiary hearing on these allegations, and this Court will not indulge his speculations by allowing him to reopen factual matters properly settled almost thirty years ago. *Cf. Moreno–Morales v. United States,* 334 F.3d 140, 145 (1st Cir.2003) (noting in the context of a section 2255 petition that "there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted").

With respect to the two factual issues on which Murray has made the requisite preliminary showing, the Court rules that neither issue was material to any of the proceedings involved in Murray's conviction. Even had Agent Keaney provided false information in the search warrant affidavit, probable cause existed without that information and the warrant would have issued regardless of its presence. Any false testimony by Agent Cleary at the suppression hearing or trial was likewise immaterial to the jury's verdict. Lastly, the government's failure to disclose to Murray that Bulger had acted as an informant against him was not reasonably likely to have changed the result of the trial, so no *Brady* violation occurred.

In the background of Murray's petition is a claim he does not make: although Murray's allegations touch on a number of undeniably important constitutional interests, he never alleges that he is actually innocent. Nor could he. Federal agents caught Murray in the process of distributing thousands of pounds of marijuana. After hearing all the evidence for and against Murray's guilt, a jury convicted him. Although some aspects of that evidence may have been false, those aspects were peripheral to the core of the prosecution's proof that Murray was involved in a conspiracy to distribute huge amounts of marijuana.

There can be no doubt that revelations about agents' interactions with Whitey Bulger have besmirched the FBI's reputation. *See, e.g., U.S. v. Connolly,* 341 F.3d 16 (1st Cir.2003) (affirming conviction of FBI Agent John Connolly for racketeering, obstruction of justice, and making false statements arising out of his criminal involvement with Bulger while ostensibly handling Bulger as an informant for the FBI); *Litif,* 682 F.Supp.2d 60 (holding the FBI liable to families of certain of Bulger's victims because of agents' negligence in protecting Bulger as an informant); *McIntyre,* 447 F.Supp.2d 54. Murray seeks to take advantage of such revelations by asserting outlandish conspiracy theories about the actions of Bulger and the FBI agents who investigated his drug opera-

tion. Murray's self-serving speculation cannot serve as the basis for a writ of coram nobis.

Because any factual errors that may have occurred leading up to Murray's 1984 conviction were immaterial to that conviction, no fundamental error occurred in those proceedings. As such, Murray has failed to carry his burden on this petition for a writ of coram nobis, and the petition is DENIED. Judgment shall enter for the United States.

SO ORDERED.